### G. RICORDI & CO. v. HAMMERSTEIN.

(Circuit Court, S. D. New York. January 3, 1907.)

COPYRIGHT—SUIT TO ENJOIN PRODUCTION OF OPERA—GROUNDS FOR PRELIMINARY INJUNCTION.

A preliminary injunction to restrain defendant from producing a copyrighted opera denied, on evidence tending to show that defendant had orally been given or promised a license for the production at a stated royalty by complainant's authorized agent, and further evidence showing without contradiction that there had been negotiations for such license, and that both complainant and its agent had full knowledge that defendant was engaging singers and expending large sums of money in

preparing for the production, and did not make any objection or suggest any obstacle to the granting of a license until a considerable time after defendant's public announcement of the production, although in the meantime, while defendant's preparations were going on, an exclusive license had been granted to another manager.

[Ed. Note.—For cases in point, see Cent. Dig. vol. **11**, Copyrights, §§ 78, 79.]

In Equity. On motion for preliminary injunction.

Dittenhoefer, Gerber & James, for complainant.
Nathan Vidaver, for defendant.

TOWNSEND, Circuit Judge. The defendant, Hammerstein, claims the right to produce the opera La Boheme by virtue of an asserted oral license from George Maxwell, the representative of complainant in the United States. Hammerstein states in his affidavit that at his request Maxwell called on him early in February, 1906, and said, inter alia, that he would be pleased to have defendant produce any of the Puccini operas, including La Boheme, except Madam Butterfly, for $150 for each performance; that Maxwell assured him that $150 was the price theretofore paid by Conried for such productions; and that in reply he "told Mr. Maxwell he might regard that as settled, that I would pay $150 royalty for each performance of the Puccini operas, that I would produce La Boheme, with Bonci in the cast, provided he could get Bonci for me at a figure within reason," etc. Bonci was afterwards engaged. Defendant further states that, in a subsequent interview in the lobby of the Victoria Theater, Maxwell congratulated him on obtaining Bonci; that he (Hammerstein) repeated his inquiry as to whether Conried had been in fact paying $150 royalty a performance; and that, upon receiving a reply in the affirmative, he (Hammerstein) remarked: "All right; I will pay $150 for each performance." Hammerstein further states as follows:

"Mr. Maxwell then replied: 'Very well, it's settled; and if you wish any other of Puccini's operas, except Madam Butterfly, you may have them at the same figure.' He then asked me how often I would produce La Boheme, and I told him at least six times, perhaps more. I was not very certain. This ended the conversation."

A Mr. Guest, who, according to Hammerstein's affidavit, was present at this conversation, makes affidavit as follows:

"I heard Mr. Hammerstein say that he had secured somebody, whose name I do not recall, and Mr. Maxwell congratulated him. I heard Mr. Hammerstein say, further, 'Isn't $150 a night pretty steep?' and Mr. Maxwell, if my memory serves me rightly, replied, saying, 'It is no more than Conried paid last season.' Mr. Maxwell then stated, 'It's settled you are to produce La Boheme; and if you want any of the other operas you can have them at the same price.'"

Hammerstein further states that he met Tito Ricordi, one of the complainants, at Milan, and discussed with him his contemplated production of La Boheme, and consulted him as to singers to be engaged for the cast; that he has expended for costumes and scenery for the production of said opera some $30,000, and that he did not receive any suggestion from Maxwell that there would be any objection to its production until the 25th day of July, 1906, after his public announcement

that he had made arrangements to produce La Boheme; and that on said date he received a letter, a copy of which he annexes to his affidavit, in which Maxwell merely notifies him that the opera is copyrighted, and makes no mention of any contract with Conried for its exclusive production.

Various other facts bearing on the controversy are alleged in the Hammerstein replying affidavits or are shown by other papers. Hammerstein states that he told one of the complainants that he had engaged Bassi for La Boheme, among other operas, and that said complainant approved the selection, and that he made contracts with various celebrated artists, providing specifically for their appearance in La Boheme; and it appears from the affidavits on both sides that any reputable and responsible manager was allowed to produce La Boheme, upon furnishing satisfactory statements of the cast chosen for the opera and agreeing to pay a license fee.

Maxwell, in his affidavit, denies that he ever made any such contract, or that he ever had any conversation with Hammerstein in regard to a contract for the Puccini operas, other than Madam Butterfly, until the night before Hammerstein's departure for Europe. He states that he then called on Hammerstein, and that Hammerstein, in the presence of Mr. Ben Davies and Mr. William Thorner, asked him—

"If he could have La Boheme, Tosca, and Madam Butterfly, and I told him that no contracts had been made for any of them, but I did not believe he could in any event have Madam Butterfly. * * * He then asked me to give him a contract for the others, and I said that at that time I could give him no contract and entertain no proposition until such time as he could submit a list of his proposed cast, as it was our invariable rule to make no contract for the production of any operas until the names of the artists who would sing had been submitted for approval. He replied that up to that time he had made no engagements, except Bonci and Edward de Reszke, but within ten days after his arrival in Europe he would advise me of the various artists he proposed to engage. I told him on receipt of such advice I would consider the question of a contract with him. He then asked for a letter of introduction to complainant, and I gave him one."

Messrs. Davies and Thorner confirm the material statements as to this conversation, and both state that no contract or license was granted by Maxwell on that occasion. Maxwell further states that he called on Tito Ricordi, one of the complainants, in Italy in May; that Ricordi informed him that Hammerstein had in March requested permission for the production of the Puccini operas, and that he told him that the rights for the United States had been given solely and exclusively to Maxwell; that he (Maxwell) called on one Fano, said to be the agent of the defendant in Milan, and stated that he had not yet received any information from Hammerstein as to his plans in reference to La Boheme, and suggested that he cable to Hammerstein for instructions; that Fano sent a cable, but that he (Maxwell) never heard anything from Hammerstein. Maxwell further states that Fano has admitted that he sent the cable to Hammerstein, as stated by Maxwell, and that Hammerstein could not have expended any such sum as he said he did for costumes and scenery.

It is to be observed that none of the allegations in complainant's affidavits, except Maxwell's denial, meet the statement by Hammer-

stein, confirmed on one occasion by Guest, of a license or agreement to license; and most of the assertions and counter assertions may be so harmonized as to show that, even if said agreement was not originally made, Maxwell and Tito Ricordi by their conversation and conduct led or permitted Hammerstein to make said contracts and incur said expenses upon the faith of an understanding that a license would be given him to produce La Boheme, provided the usual conditions were complied with. There is much force, therefore, in the argument that it was not until after Conried recognized the prominence of Hammerstein as an operatic rival that any objection was made to the production of La Boheme, as contemplated by Hammerstein. In fact, the affidavits of complainant and the Maxwell letter, which fails to suggest any exclusive license, support these assertions. It is admitted by Maxwell that he did not give to Conried the exclusive right for the production of said opera for the coming season until on or about the 14th day of May, 1906.

It may be assumed that Hammerstein offered to advise Maxwell of the artists he proposed to engage within a given time. But it does not appear that Maxwell asked for or insisted upon any fixed time for such notice; and Tito Ricordi, to whom Maxwell had given Hammerstein a letter of introduction, states that, when Hammerstein spoke to him about arrangements for producing La Boheme, he told him "that, if he desired to produce the same or any other operas controlled by us, he would have to apply to, and make terms with, the said Maxwell." Hammerstein states that on his return from Europe, and thereafter, he called at Maxwell's office, and later tried to get into communication with him, but that Maxwell was at first in Europe, and that later, whenever he (Hammerstein) inquired for or telephoned him, he was informed that Maxwell was not in. It is nowhere claimed that Maxwell ever gave Hammerstein any notice of any intention to grant an exclusive right to Conried, or to take any action inconsistent with the statements made to Hammerstein by him and by the complainant Tito Ricordi.

In these circumstances, and after complainant's agent (Maxwell) had "informed him (Hammerstein) that up to that time I had not made any contracts for the said operas," and had "told him on receipt of such advice I would consider a contract with him," and Tito Ricordi had referred him to Maxwell, if complainant concluded to discriminate against Hammerstein by granting an exclusive license to Conried, thus disabling itself from granting to Hammerstein a license upon such terms as it was in the habit of granting to other persons, it was its duty to seasonably notify him of such proposed action. But, although Maxwell states that he made the exclusive license to Conried in May, he did not notify Hammerstein of that fact even so late as July 25th, and the letter then written might fairly be interpreted merely as a notice of complainant's copyright rights. In this discussion I have not overlooked the statement as to the Fano cable: "Maxwell in Milan. Have you any instructions?" Even, however, if it was sent, and even if it be assumed that it was received by Hammerstein, which he denies, it clearly was no notice of a proposed withdrawal of the offer to allow Hammerstein to produce La Boheme, or of any objection to such production.

It is true, as argued by counsel for complainant, that a court of equity should not permit the enforcement of an alleged oral license to use a copyrighted musical production without satisfactory and convincing proof. And, if the claim of defendant in this case depended merely on his statement that such a license was granted, this court might not be justified in refusing the injunction. But here it appears from complainant's own affidavits that neither the complainant in Milan nor his agent in New York ever raised or suggested any objection to defendant's application for a license, except that relating to the submission of the proposed cast, and that from the time when Maxwell called on Hammerstein in February, and during all the time when complainant was in a position to know, and upon its own statements must be presumed to have known, of Hammerstein's plans, it failed to notify him of any objection to the production of La Boheme, except as above stated. And after the complainant at Milan had referred defendant to its agent (Maxwell) in New York, and had told Maxwell that it had done so, Maxwell, without notice to defendant, gave an exclusive license to Conried, and permitted Hammerstein to continue his preparations for the production of La Boheme.

An injunction is granted, not ex debito justitiæ, but in the sound discretion of the court, in view of all the circumstances of the particular case. For the reasons stated above, complainant should not be permitted to raise objections, now interposed for the first time, as a ground for a preliminary injunction. And this court, sitting as a court of equity, would not be justifed in enforcing such objections by injunction before the questions at issue have been fully tested and satisfactorily determined upon examination and cross-examination of witnesses. Especially is this so in view of the great hardship which would be imposed thereby on defendant, in view of the contracts made and expenses incurred on the faith of the situation produced or permitted by Maxwell and Ricordi, as established by their own statements.

The motion is denied.